[No. 23594-7-III.   Division Three.   December 22, 2005.]

*In the Matter of the Welfare of* J.M.

*Susan M. Gasch* (of *Gasch Law Office*), for appellant.

*Robert M. McKenna, Attorney General*, and *Lisa L. Simonsen, Assistant*, for respondent.

¶1 SWEENEY, J. — A parent faced with the prospect of termination of parental rights to his or her child is entitled to a meaningful hearing, and that includes effective representation of counsel. The rights at stake are both fundamental and constitutional. Here, a mother's lawyer stipulated to the admission of relevant but highly damaging written reports by nontestifying experts. The reports all came into court by way of witnesses who were not experts in the relevant fields and could not be cross-examined as to the substance of the reports. This was not effective representation. And we reverse the judgment terminating this mother's parental rights and remand for another hearing.

## FACTS

¶2 The superior court terminated the parental rights of RC to her six-year-old daughter, JM. The termination hearing was held on October 25, 2004. RC discussed the case with her appointed counsel in the hallway before the hearing. She became distraught and left the building. And the hearing proceeded without her. The State called the only witnesses—Department of Social and Health Services social worker Julia Ross and guardian ad litem Amy Hoyt.

¶3 The court admitted the State's proffered exhibits, including written reports by several experts. Defense counsel reviewed the exhibits and approved their admission.

¶4 Ms. Ross testified that the department had received nine previous referrals dating back to 1997, mostly involving JM's two older siblings. There had been three additional referrals that also alleged domestic violence involving RC's former domestic partner. In the current proceedings, RC was tested for substance abuse. The diagnosis was "deferred." Report of Proceedings (RP) at 16, 20. She nevertheless continued to submit urinalysis samples. These were consistently negative. But RC was convicted of driving under the influence (DUI) and third degree assault in resisting arrest in September 2003. She had also been cited for DUI in August 2002.

¶5 RC had engaged fully in the services offered with regard to the dependency of JM with the exception of visitation.

¶6 Ms. Ross testified to the observations and opinions expressed in written reports by psychologist Andrew B. Forsyth, PhD; child mental health specialist Carol Thomas; therapist Barbara Folden; and visitation therapist Mary Anne Sacco. Ms. Ross testified about interactions between RC, Ms. Folden, and Ms. Sacco.

¶7 From Dr. Forsyth's reports, Ms. Ross testified that RC exhibited an unspecified personality disorder with histrionic and narcissistic features and also "child neglect, failing

to protect." RP at 22. As to her parenting abilities, Ms. Ross testified that RC appeared to Dr. Forsyth to be " 'an intelligent and socially poised individual whose apparent psychological defenses include denial, defensiveness, and externalizing responsibility, projecting blame on others for her actions.' " RP at 22 (quoting Ex. 5). Ms. Ross testified that Dr. Forsyth's prognosis was "very poor because [RC] was not motivated to engage in counseling." RP at 22. Based on additional information provided by Ms. Ross, Dr. Forsyth had added "a number of borderline personality features" to his diagnosis. RP at 25. Ms. Ross testified that Dr. Forsyth recommended treatment with someone experienced with "borderline personality disordered people." RP at 25.

¶8 Ms. Ross also testified about a parent-child attachment assessment performed by Ms. Thomas. Ms. Ross said Ms. Thomas stated that JM had shown "anxious and avoidant attachment and considers mom to not be reliable to meet her need for safety, security, or physical needs that she had." RP at 23. Ms. Thomas, according to Ms. Ross, had recommended visitation in a "therapeutic" setting. RP at 23.

¶9 Ms. Ross also testified about the interactions between RC and Ms. Sacco, a visitation therapist. JM had entered shelter care in April 2003. RC began visits in June and visited regularly. The visits stopped in September. In February 2004, Ms. Sacco became involved and RC began another period of regular visitation that lasted until May 24. Ms. Ross testified that to all outward appearances these visits were successful. But Ms. Sacco concluded that the apparent success was because JM was "accommodating" her mother. RP at 32.

¶10 Ms. Sacco's contract was solely to observe and evaluate the success of visitation sessions. RP at 32. But on May 24 she met with RC to "discuss the case plan" and "identify the problems or issues of why [JM] was removed and to look at progress and or services that would address any issues that were unresolved." Ex. 9 at 1. Through Ms. Ross, the

court heard Ms. Sacco's report, including her opinion that RC was completely relaxed for two hours with JM. Within minutes with Ms. Sacco, however, RC became enraged. Ex. 9 at 1. The department terminated all visitation until RC sorted things out with Ms. Sacco. This never happened, and RC had not resumed visitation as of the October hearing date. Defense counsel asked Ms. Ross no questions.

¶11 Ms. Hoyt, the current guardian ad litem, testified. She saw JM several times in the home of the proposed adoptive foster parents and once with her mother during visitation at a day-care center. Ms. Hoyt thought JM appeared to have a relationship of greater "comfort and a safety" with the foster mother. RP at 43. Ms. Hoyt also testified about Ms. Thomas's statements regarding JM's statements to Ms. Thomas about wanting one mom instead of two. RP at 48. Apparently relating her understanding of Ms. Thomas's observations, Ms. Hoyt testified that JM showed physical signs of distress—night terrors and bed-wetting, for example—during periods of visitation with RC but not during the periods of no contact with her. Ms. Hoyt testified to "the mother's lack of insight into her own self and her child's well being, her continued troubles with substance abuse, the anger and denial, the escalating anger that has been reported of late, her inconsistent participation." RP at 47. Again, there was no cross-examination.

¶12 The State also introduced the written report of a previous guardian ad litem in unrelated non-State custody proceedings regarding RC's older children. Ex. 1.

¶13 Substance abuse is cited repeatedly throughout the testimony and reports. Yet exhibit 6 contains 21 pages of 21 urinalysis tests done between March and June 2004. Of the 21 results, all are negative for alcohol. In 21 of 21, the concentration of propoxyphene[1] is 300 ng/ml.[2] This is reported as a negative result in 17 of the 21 tests. In 4 tests,

---

[1] One of ten substances tested for in each urinalysis.

[2] Nanograms of substance per milliliter of fluid is the standard unit of measurement in urinalysis testing.

the same concentration is reported as positive. All 21 results for opiates are 300 ng/ml. This is reported as negative in all but 1 of the 21 tests. Ex. 6. There was, however, no challenge to or explanation of this discrepancy. The defense consisted of the following statement by counsel:

> Thank you, your Honor, may it please the Court, I will not be calling any witnesses. I would make the following comment: I did have occasion to speak to my client, Ms. . . . . Her position has been consistent all the way along. She disputes—emphatically disputes any and all of the allegations and contentions in this matter, does not understand why the State is desirous of taking [JM] away from her, and just feels this is totally wrong.
>
> Thank you, your Honor.

RP at 51-52.

¶14 The court incorporated data from the reports of Dr. Forsyth, Ms. Thomas, Ms. Folden, and Ms. Sacco in its findings of fact. The court called the reports clear, cogent, and convincing. The court ordered JM into the permanent legal custody of the department.

## DISCUSSION

¶15 RC assigns error to her counsel's failure to object to the introduction of crucial evidence from absent witnesses with no possibility for cross-examination.

### INEFFECTIVE ASSISTANCE OF COUNSEL IN PARENTAL TERMINATION PROCEEDINGS

¶16 RC contends that she was denied due process of law, specifically, effective representation of counsel. She contends competent counsel would at a minimum have: challenged the qualifications of the social worker and the guardian ad litem to offer expert opinions, objected to the admission of the exhibits (experts' reports) as substantive evidence, objected to the admission of a report by a different guardian ad litem for RC's older children in prior non-State

custody proceedings, and challenged the admission of any criminal history.

¶17 The State responds that RC applies the wrong test for ineffective assistance of counsel. The test RC relied on, *Strickland v. Washington*,[3] applies to criminal cases. This is a termination case. The correct standard, the State submits, is set out in *In re Moseley*.[4] And under the *Moseley* standard, unless the parent can show that she did not receive a meaningful hearing, counsel's effectiveness is presumed. *In re Moseley*, 34 Wn. App. 179, 184, 660 P.2d 315 (1983).

*Standard of Review*

¶18 Whether a proceeding satisfies constitutional due process is a question we review de novo. *City of Redmond v. Moore*, 151 Wn.2d 664, 668, 91 P.3d 875 (2004).

*Test for Effective Representation*

¶19 The State argues that the standard for effective legal representation in a deprivation proceeding under chapter 13.34 RCW is less stringent than that required in criminal proceedings. Specifically, the State contends that, to show prejudice, a parent must show that he or she did not receive a meaningful hearing. RC would instead apply the *Strickland* test.

¶20 No published Washington case has expressly held that *Strickland* applies to the performance of counsel representing parents in proceedings to terminate their parental rights. We do not pass on the issue directly, however, because the issue is not squarely presented here. We conclude that RC did not receive effective assistance of counsel by any standard. We will nonetheless take this opportunity to compare these standards and to comment.

---

[3] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[4] *In re Moseley*, 34 Wn. App. 179, 660 P.2d 315 (1983).

█ ¶21 Terminating parental rights is one of the severest of state actions and implicates fundamental interests. *M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996). When the state moves irrevocably to sever the parent-child bond, the rights of parents to protection from "unwarranted usurpation" by the state are guaranteed by the Fourteenth Amendment. *Id.* This means the state must "ensure that judicial proceedings are fundamentally fair." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 33, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981).

█ █ ¶22 In criminal prosecutions, fundamental fairness requires that the state appoint counsel for indigent defendants. *Id.* at 25 (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)). In criminal proceedings, representation of counsel means effective representation. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The right to counsel in termination proceedings, by contrast, is left to the states. *Lassiter*, 452 U.S. at 33-34. The question of what process is due involves the balancing of the private interest at stake, the government's interest, and the risk that the procedure used will lead to an erroneous result. *Id.* at 31; *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

█ ¶23 It is well settled in Washington that the right to counsel attaches to indigent parents in termination proceedings by way of RCW 13.34.090(2). *In re Dependency of Grove*, 127 Wn.2d 221, 232, 897 P.2d 1252 (1995). This right derives from the due process guaranties of article I, section 3 of the Washington Constitution as well as the Fourteenth Amendment. *In re Welfare of Luscier*, 84 Wn.2d 135, 138, 524 P.2d 906 (1974). The right to the custody, control, and companionship of one's children is a fundamental right that the State may not abridge without the complete protection of due process. *Id.* at 136-37. "There can be no doubt that the full panoply of due process safeguards applies to deprivation hearings." *Id.* at 137; *In re Welfare of Myricks*, 85 Wn.2d 252, 254-55, 533 P.2d 841 (1975).

■ ¶24 By statute also—not just in criminal proceedings but in every case in which the right to counsel attaches—legal representation means effective representation, by definition. Former RCW 10.101.005 (1989).[5]

¶25 The State argues from language in a pre-*Strickland* termination decision, *In re Moseley*. In that case, we stated that the test for prejudice in deprivation proceedings was whether the hearing was "meaningful." *Moseley*, 34 Wn. App. at 184. The State asks us to distinguish this from the "fair" hearing which *Strickland* defines as one in which confidence in the result is not undermined by counsel's performance. *Strickland*, 466 U.S. at 687. We are not persuaded by the State's perceived distinction between "meaningful" and "fair." On this briefing and these facts, we pronounce no holding on the matter, however.

*Termination Hearing*

¶26 The State's power to permanently deprive a parent of rights to his or her children is established when the State proves, by clear, cogent, and convincing evidence, six statutory requirements. RCW 13.34.180. Here, RC concedes the first four: that the child is dependent, a dispositional order has been entered, the child has been out of the home for more than six months, and necessary services have been offered. She disputes the sufficiency of the evidence, however, to establish the last two: that conditions will not likely be remedied in the near future and that continuing the parent-child relationship will diminish JM's chances to integrate into a stable home.

■ ¶27 RC's main complaint is her counsel's failure to challenge the admissibility of documents including psychological assessments, progress notes, and recommendations by Ms. Folden, Ms. Thomas, Ms. Sacco, and Dr. Forsyth. She contends that the evidence against her came

---

[5] "The legislature finds that effective legal representation should be provided for indigent persons . . . consistent with the constitutional requirements of fairness, equal protection, and due process in all cases where the right to counsel attaches." Former RCW 10.101.005.

from the writers of these reports. These adverse witnesses were not present in court. Instead, their opinions were merely parroted by live witnesses who were neither qualified as experts in psychiatric evaluation nor competent to testify to events witnessed and mental impressions formed by others. Even if the live witnesses had been bona fide experts, RC complains, material recited as the basis for an expert opinion is hearsay and is not admissible as substantive evidence. *State v. Martinez*, 78 Wn. App. 870, 879, 899 P.2d 1302 (1995).

¶28 RC contends that fairness required an opportunity to test both the written expert opinions and the oral subjective accounts by confrontation and cross-examination. Ultimately, she observes, her lawyer did nothing. And this was ineffective assistance of counsel.

¶29 RC contends the prejudice is obvious, because the trial court relied on the reports as substantive evidence and incorporated them verbatim into its findings. She points to the court's dispositive findings that the parent-child relationship was unlikely to improve and that termination was in JM's best interest as being based solely on this evidence. So, without the inadmissible evidence, there was virtually no evidence to support the court's findings, and the State failed to meet its burden of proving RCW 13.34-.180's termination factors by clear, cogent, and convincing evidence.

¶30 The State responds that the records of nontestifying expert witnesses were admissible (a) because they are business records and (b) because counsel stipulated to their admissibility. Business records are admissible under a well-recognized exception to the prohibition against hearsay and the stipulations were a legitimate trial strategy in this case.

¶31 The Uniform Business Records as Evidence Act, chapter 5.45 RCW, makes certain records admissible as evidence. RCW 5.45.020. This includes records such as "payrolls, accounts receivable, accounts payable, bills of lading," and similar records that are "the routine product of

an efficient clerical system." *Young v. Liddington*, 50 Wn.2d 78, 83, 309 P.2d 761 (1957) (citing *N.Y. Life Ins. Co. v. Taylor*, 79 U.S. App. D.C. 66, 147 F.2d 297, 300 (1944)). What such records have in common is that cross-examination would add nothing to the reliability of clerical entries: no skill of observation or judgment is involved in their compilation. *N.Y. Life*, 147 F.2d at 301.

¶32 The records at issue here were hardly routine clerical notations of the occurrence of objective facts. The evidence documented in these records involved a high degree of skill of observation, analysis, and professional judgment. The business records exception does not, then, apply.

¶33 Moreover, the business records exception does not, nor should it, allow for the admission of expert opinions for which the opportunity to cross-examine would be of value—like psychiatric diagnoses. *Id.* at 299-300. Documentary evidence is inadmissible as a business record for the purpose of proving conclusions recorded in them. *Miller v. Arctic Alaska Fisheries Corp.*, 133 Wn.2d 250, 260 & n.4, 944 P.2d 1005 (1997) (citing *Young*, 50 Wn.2d at 83 (medical record containing expressions of doctor's opinion)). Progress notes, evaluations, test results, and reports by nontestifying witnesses are, then, not admissible as business records. *State v. Nation*, 110 Wn. App. 651, 662, 41 P.3d 1204 (2002).

¶34 ER 705 provides that material relied on by a testifying expert in reaching an opinion may be discussed. *Id.* ER 703 provides that facts and data upon which a testifying expert bases an opinion, if of a type reasonably relied upon by experts in the particular field in forming opinions, need not be admissible in evidence. ER 705 says the expert may disclose the facts he or she relied on. But ER 705 is not a mechanism for admitting otherwise inadmissible evidence. *Id.* An expert's use of the written reports of absent witnesses is not substantive evidence; they are admissible solely to show the grounds upon which the testifying

expert's opinion is based. *State v. Wineberg*, 74 Wn.2d 372, 382, 444 P.2d 787 (1968).

¶35 Here, the caseworker and the guardian ad litem did not form the expert opinions they gave. The reports *were* the expert opinions. The witnesses were merely the communicators.

¶36 The potential loss of a significant and constitutionally protected liberty interest requires a meaningful hearing. This means, at a minimum, the opportunity to argue the strengths of one's own position and to attack the State's position. *Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1287 (W.D. Wash. 1994), *aff'd*, 64 F.3d 1432 (9th Cir. 1995); *Goldberg v. Kelly*, 397 U.S. 254, 267-68, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970). Here, we see no attempt to defend RC's position or to attack the State's position. Counsel simply took the State's evidence at face value and recited that his client disagreed.

¶37 The State asserts that RC could have cross-examined or helped her lawyer to cross-examine these experts if she had stayed for the hearing. How? The witnesses were not present. And we doubt that the cross-examination of experts would have been within her capabilities, in any event. That is what a lawyer is supposed to do.

¶38 We conclude that this hearing was neither meaningful nor fair, and RC was actually prejudiced by the failure of due process. We can only speculate as to what weaknesses in the State's case or strengths in RC's case might have been revealed by competent counsel.

¶39 We reverse the judgment terminating RC's parental rights to JM.

KATO, C.J., and BROWN, J., concur.