2014 AUG 11 AM 10: 27


IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Dependency of<br>A.G., dob 2/7/97, and<br>D.G., dob 2/21/98,<br><br>Minor children,<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>Respondent,<br><br>v.<br><br>ANNE MARIE BUTCHER,<br><br>Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 71000-1-I<br><br>(Consolidated with No. 71001-0-I)<br><br><br><br>UNPUBLISHED OPINION<br><br><br><br><br><br>FILED: August 11, 2014 |

SCHINDLER, J. — Anne Marie Butcher appeals the decision to terminate her parental rights with her two teenage children on the grounds that her attorney provided ineffective assistance of counsel by introducing a psychological/parenting evaluation into evidence. Because Butcher cannot establish ineffective assistance, we affirm.

FACTS

Anne Marie Butcher is the mother of 17-year-old A.G. and 16-year-old D.G.[1] A.G. was born in 1997 and D.G. was born in 1998. Butcher and her children lived in

---

[1] By the time of trial, Butcher had changed her name to Anne Marie Luke. But the parties refer to the appellant as Anne Marie Butcher. For consistency, we refer to her as Butcher.

Spring Hill, Florida. In 1999, 19-year-old Butcher was convicted of possession of a controlled substance. In 2002, Butcher pleaded guilty to two counts of fraud and served 10 months in prison.

In 2010, Butcher married Steven Butcher.[2] In January 2011, Butcher, Steven, and her children moved to Oak Harbor, Washington in order to be near one of Steven's children from a prior marriage. Steven physically abused Butcher, resulting in at least one hospitalization. The couple separated in June 2011. In July 2011, Butcher began dating Brad Crockett.

On September 27, 2011, 13-year-old D.G. was locked out of the house and did not know how to contact his mother. A neighbor called the Oak Harbor Police Department. D.G. told Detective Sergeant Terri Gardner that he was often locked out of the house, there was no food, and his mother often got home late or did not come home at all. D.G. told the detective that he had been staying with friends since September 21. The police department referred the case to the Washington State Division of Children and Family Services (DCFS).

The next day, a social worker and Detective Sergeant Gardner spoke to 14-year-old A.G. A.G. said her mother was rarely home, there was little food at the house, that her mother drank alcohol, and her mother struggled with drug use.

DCFS took A.G. and D.G. into protective custody. On September 30, 2011, the Washington State Department of Social and Health Services (DSHS) filed a dependency petition. The dependency petition asserts, in pertinent part:

> DCFS remains seriously concerned at the mother's inability to provide the basic needs of her children (i.e. medical and food). In addition, the mother reports significantly differing accounts of her children's behavior in

---

[2] We refer to Steven Butcher by his first name for clarity.

comparison to the consistent disclosures of her children and community members. The mother's lack of basic parenting, general supervision, and disregard for the basic safety of her teen boy, is both alarming and detrimental to the children's development.

On November 30, 2011, Butcher entered into an agreed order of dependency. Butcher admitted a history of substance abuse and agreed to obtain a drug and alcohol evaluation. Butcher stipulated to the following facts:

> Mother acknowledges . . . her history of substance abuse. Mother agrees to obtain a drug/alcohol evaluation. Mother also acknowledges a history of [child protective services] involvement in the State of Florida when she was a child.

The children remained in out-of-home care. The court ordered supervised visitation a minimum of one hour per week.

The November 30 disposition order required Butcher to engage in a drug and alcohol evaluation, obtain random urinalyses (UAs), obtain a psychological evaluation with a parenting component, and follow all recommendations.

In January 2012, Butcher moved to Glendive, Montana with Crockett. Butcher did not tell A.G. or D.G. that she was moving to Montana. Butcher kept in "[s]poradic" contact with A.G. and D.G., mostly initiated by the children.

In April 2012, DSHS assigned social worker Debra Antetomaso to the case. Antetomaso contacted Butcher and provided her with contact information for service providers closest to where Butcher was living in Montana.

In August 2012, Butcher visited the children at the DSHS office in Oak Harbor. Butcher told Antetomaso and the children that she was going to try to move back to Oak Harbor. Butcher never moved back to Washington.

On September 19, the State filed a petition for termination of Butcher's parental rights. The petition alleged, in pertinent part:

> The parenting deficiencies that led to the dependency of this child centered on the mother's domestic violence relationship, substance abuse history, lack of parenting skills, lack of stable residence and suspicion that there may be some mental health issues. Services offered to the mother have included the drug/alcohol evaluation and treatment, random UA testing, parenting classes, psychological evaluation, and casework management.

The petition also alleged that there was little likelihood that conditions would be remedied in the near future: "The mother has failed to participate in a drug/alcohol evaluation and treatment, random UA testing, or a psychological evaluation. She has not demonstrated the ability [to] care for her children."

Butcher contacted a psychologist in Montana, Dr. F. Tom Peterson, to comply with the requirement to obtain the court-ordered psychological/parenting evaluation. Dr. Peterson met with Butcher on October 3, 2012. In the "Psychological/Parenting Evaluation," Dr. Peterson states that if Butcher pursues treatment, she would likely be able to parent.

> Should Ms. Butcher seek treatment as recommended, there is a very good chance that she will develop parenting skills not subject to unpredictable disruption within a few months.

Dr. Peterson recommended mental health counseling and medication, including treatment for attention deficit hyperactive disorder. Dr. Peterson states, in pertinent part:

> Intervention must include medical treatment for dysregulated, depressed mood if Ms. Butcher is to be able to consistently and adequately discharge parental responsibilities in the foreseeable future. It is not enough that she stay in contact with the children's social worker . . . . Psychomedical treatment is required.

Dr. Peterson also states in the Psychological/Parenting Evaluation that Butcher is "genuinely desirous of regaining custody," and that "Ms. Butcher's motivation for custody appears to be the love she has for each of her children."

> Ms. Butcher possesses strong average intellect and appears physically capable. Despite appearing somewhat emotionally detached from her children, she impressed this examiner as genuinely desirous of regaining custody. Examination procedures determined that she possesses a strong knowledge of each of their developmental histories and aware of their interests.

Butcher divorced Steven Butcher sometime in the spring of 2013. In April 2013, Butcher moved to Atlantic Beach, Florida to live with her mother. Butcher did not tell A.G., D.G., or DSHS that she was moving to Florida.

On May 15, 2013, the court entered a permanency planning hearing order. The order states that Butcher had not provided documentation of participation in domestic violence support services through Citizens Against Domestic and Sexual Abuse (CADA), obtained a drug and alcohol evaluation, or provided random UAs. The court ordered Butcher to participate in a drug and alcohol evaluation, provide random UAs, participate in domestic violence services through CADA, and pursue mental health counselling and medication management as recommended by Dr. Peterson in the Psychological/Parenting Evaluation.

On June 3, 2013, after Antetomaso learned Butcher had moved back to Florida, Antetomaso sent Butcher a letter asking whether she needed any assistance in obtaining domestic violence services or a drug and alcohol evaluation. Antetomaso spoke with Butcher on the phone in late June. According to Antetomaso, Butcher was aware of the services she needed to engage in but did not ask for any assistance in obtaining those services.

The termination trial began on June 25, 2013. Butcher appeared by telephone from Florida. The State introduced into evidence the dependency petitions, the orders of dependency, and the permanency planning hearing orders as to each child. Butcher's attorney offered, and the court admitted into evidence, the Psychological/ Parenting Evaluation.

Butcher testified the children had Sioux Indian heritage. The court continued the trial to August 27, 2013 in order to determine whether the Indian Child Welfare Act (ICWA), 25 U.S.C. ch. 21, applied.[3] After sending notices to several tribes, the State determined the ICWA did not apply. At the end of July, Butcher moved back to Montana with Crockett.

When the trial resumed on August 27, the State called social worker Antetomaso, Butcher, A.G., and D.G. to testify. Butcher appeared by telephone from Montana.

Social worker Antetomaso testified that "there is little likelihood that her parental deficiencies could be remedied by allowing the children to return" and Butcher was "unfit to parent."

The State also called Butcher to testify. Butcher admitted that she did not contact the service providers Antetomaso referred her to in Florida or Montana, and she made no attempt to contact anyone about a drug and alcohol evaluation. Butcher acknowledged she read the Psychological/Parenting Evaluation, understood that it told her to seek counselling and medication, but said she did not believe she needed either treatment or medication.

Fifteen-year-old D.G. testified that "I would rather be with a foster family that I'm living with right now because they're a lot more stable" and he's "happy there." Sixteen-

---

[3] The court entered an order terminating the parental rights of the father, Daniel Gilman.

year-old A.G. testified that her life with the foster family was "very stable. . . . I am provided for. I have all of my needs met. I'm happy." A.G. said that the "most important thing" to her was "[s]tability. A good home to come back to."

A.G. testified that when she lived with her mother, they moved around a lot, and she did not spend a full year at the same school until she moved to Washington. A.G. said that she and her brother would often live with relatives for several months at a time. A.G. testified that food was "pretty scarce" at the end of the month after food stamps ran out. A.G. said she had been locked out of the house and her mother would often leave without telling A.G. where she was going. A.G. testified that she had witnessed violence between her mother and the men in her mother's life.

A.G. testified she did see her mother use drugs "[b]ut there were signs," such as "[t]he bong in the bathroom, and sometimes like a towel in the door." A.G. said that she did not want to live with her mother and wanted to be adopted.

The court admitted the reports submitted by the guardian ad litem/court-appointed special advocate (CASA). The CASA recommends that the court terminate Butcher's parental rights to both A.G. and D.G. The reports state that A.G. and D.G. are "happy and secure" in their foster homes.

The CASA report as to D.G. states that D.G's "mother resides in Florida and is not able to provide a home for [D.G.]" The report also states that Butcher has not communicated with D.G. in one month. As to A.G., the CASA report states that A.G.'s "mother resides out of state and is not able to provide a home for [A.G.]," and that A.G.'s foster family wishes to adopt her. The reports state that while the children are in

different homes, the caregivers communicate regularly, and the children see each other

"at least once every two weeks" and speak to each other "frequently."

The court entered an order terminating Butcher's parental rights to A.G. and D.G.

The order contains detailed findings of fact and conclusions of law.[4] The court found

that termination of Butcher's parental rights was in the best interests of A.G. and D.G.

and that Butcher was unfit to parent the children. Butcher appeals.

## ANALYSIS

Butcher contends she is entitled to reversal of the termination orders because

her attorney provided ineffective assistance of counsel by introducing into evidence the

Psychological/Parenting Evaluation.

In order to terminate parental rights, the six statutory elements set forth in RCW

13.34.180(1) must be established by clear, cogent, and convincing evidence. RCW

13.34.190(1)(a)(i); In re Dependency of K.R., 128 Wn.2d 129, 140-41, 904 P.2d 1132

(1995).[5] Proof of the six statutory elements establishes that the parents are currently

---

[4] Butcher does not challenge the findings of fact. Therefore, they are verities on appeal. In re Marriage of Possinger, 105 Wn. App. 326, 338, 19 P.3d 1109 (2001).

[5] RCW 13.34.180(1) provides, in pertinent part:

    (a) That the child has been found to be a dependent child;

    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

    (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

    (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

    (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

    . . . .

    (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

unfit and satisfies due process. In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011). If DSHS establishes the statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence, the court then considers whether termination of the parent-child relationship is in the best interests of the child. RCW 13.34.190(1)(b). Whether termination is in the best interests of the child must be proved by a preponderance of the evidence. In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Where the needs of the child and the rights of the parent conflict, the needs of the child must prevail. In re Dependency of J.W., 90 Wn. App. 417, 427, 953 P.2d 104 (1998).

Parents have a statutory right to representation by counsel at all stages of a dependency proceeding. RCW 13.34.090(2); In re Dependency of V.R.R., 134 Wn. App. 573, 581, 141 P.3d 85 (2006). This right includes the right to effective legal representation. V.R.R., 134 Wn. App. at 580.

To prevail on her claim of ineffective assistance of counsel, Butcher must show (1) deficient performance by counsel and (2) resulting prejudice. In re Dependency of S.M.H., 128 Wn. App. 45, 61, 115 P.3d 990; Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).[6]

There is a strong presumption of effective representation of counsel, and Butcher has the burden to show that based on the record, there are no legitimate strategic or

---

[6] The parties assert that Washington law is unsettled as to the standard that applies in determining whether a parent received effective assistance of counsel in a termination proceeding. See In re Welfare of J.M., 130 Wn. App. 912, 920, 125 P.3d 245 (2005) (applying standard from In re Moseley, 34 Wn. App. 179, 184, 660 P.2d 315 (1983)). However, because this court applied the Strickland standard to determine ineffective assistance of counsel in termination cases in S.M.H., we adhere to that approach. S.M.H., 128 Wn. App. at 61. We also note that this approach is not inconsistent with the decision in In re Dependency of G.A.R., 137 Wn. App. 1, 150 P.3d 643 (2007). G.A.R. did not clearly adopt either the Moseley or Strickland standard. G.A.R., 137 Wn. App. at 7.

tactical reasons for the challenged conduct. State v. McFarland, 127 Wn.2d 322, 335-36, 899 P.2d 1251 (1995).

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134[, 102 S. Ct. 1558, 71 L. Ed. 2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, [350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)].

Strickland, 466 U.S. at 689. If counsel's conduct can be characterized as legitimate trial strategy, it cannot provide the basis for a claim of ineffective assistance of counsel. State v. Aho, 137 Wn.2d 736, 745, 975 P.2d 512 (1999).

Butcher contends there was no strategic reason to introduce into evidence the Psychological/Parenting Evaluation. The record does not support Butcher's argument.

The termination trial brief submitted on behalf of Butcher argues that she could "remedy her parental shortcomings in a period of time reasonably in the near future." In support, the brief quotes the conclusion of Dr. Peterson in the Psychological/Parenting Evaluation that "[s]hould Ms. Butcher seek treatment as recommended, there is a very good chance that she will develop parenting skills not subject to unpredictable disruption within a few months." The brief also relies on the Psychological/Parenting Evaluation to argue that if Butcher pursued treatment, "she is probably able to provide

marginally adequate care" to her teenage children, and that "other solutions short of termination such as guardianship and third party custody" were appropriate.

Butcher also cannot show there is a reasonable probability that but for admission of the Psychological/Parenting Evaluation, the result of the proceeding would have been different. To establish prejudice, the defendant must show "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. A defendant shows prejudice when there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694.

The first three factors under RCW 13.34.180(1), that the children were dependent, that the court entered disposition orders, and that the children had been removed for at least six months, were not in dispute. RCW 13.34.180(1)(a)-(c). As to the fourth factor, whether DSHS offered services, Butcher acknowledged Antetomaso offered her services. RCW 13.34.180(1)(d). The dispute at the termination hearing focused on the fifth and sixth statutory factors, whether conditions would be remedied so that the children could be returned in the near future, and whether continuation of the parent-child relationship diminished the children's prospects for early integration into a stable and permanent home. RCW 13.34.180(1)(e), (f).

Butcher claims trial counsel's decision to introduce the Psychological/Parenting Evaluation resulted in prejudice because the court quoted the report in its written findings. But it is clear from the record that the decision to terminate Butcher's parental

rights relied heavily on the testimony of social worker Antetomaso, the CASA reports, and the testimony of Butcher's two children, A.G. and D.G.

Antetomaso testified that termination of parental rights was in the best interest of the children based on:

> The mother's lack of motivation to engage in services, to make herself available to her children and to provide for them their basic needs, and to address her domestic violence relationships, her mental health, need for medication management, and to address any drug/alcohol issues.

Antetomaso also testified that continuing Butcher's parental rights "would interfere with [the children's] stability, ongoing well-being and ability to have a good childhood." The CASA also recommended that the court terminate Butcher's parental rights

Further, both A.G. and D.G. testified they preferred to remain in their current, more stable placements rather than live with their mother. The court found A.G. and D.G.'s testimony credible. The oral ruling states, in pertinent part:

> I believe the testimony of [D.G.] and [A.G.] concerning what they believe to be in their best interests, and they're correct. They've shown a lot of insight into these proceedings over the course of time and in their testimony. I appreciated that they attended this trial today to show their interest and provide valuable information to the Court. They're remarkable young people.

The cases Butcher relies on, In re Welfare of J.M., 130 Wn. App. 912, 125 P.3d 245 (2005), and In re Dependency of G.A.R., 137 Wn. App. 1, 150 P.3d 643 (2007), to argue her attorney provided ineffective assistance of counsel are distinguishable. In J.M., the court held that counsel's failure to object to the admission of a damaging expert report prejudiced the parent. J.M., 130 Wn. App. at 922-23. In J.M., there was no strategic reason for the failure to object to the admission of the report, and no evidence other than the report supported the court's findings. J.M., 130 Wn. App. at

925, 923. In G.A.R., counsel did not object to the admission of expert reports. G.A.R., 137 Wn. App. at 4. But again, there was no strategic reason for failing to object, and the social worker was the only witness to testify for the State. G.A.R., 137 Wn. App. at 4-8.

Because Butcher cannot establish ineffective assistance of counsel, we affirm.

WE CONCUR: