

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 35632-9-III |
| L.J. | ) | (consolidated with |
| | ) | No. 35633-7-III) |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| In the Matter of the Parental Rights to | ) | |
| | ) | |
| L.B. | ) | |

SIDDOWAY, J. — After an almost two-year dependency, the trial court terminated

the appellant father's parental rights to his sons L.B[1] and L.J. He appeals the termination

order, arguing (1) the trial court erred when it denied his request to continue trial so that

he could present evidence of relative placement options, (2) the denial of the motion

interfered with his right to counsel, and (3) insufficient evidence supports the trial court's

---

[1] There is a discrepancy between our caption and that on the findings, conclusions, and order of termination. The caption on that final order reverses the order of the boys' names from the caption used in earlier pleadings and incorrectly identifies the surname of the older of the two boys. We conform our caption to the petition.

findings that (a) he was currently unfit to parent L.B. and L.J. and (b) termination of his parental rights was in the boys' best interest. The court did not err or abuse its discretion and substantial evidence supports its findings. We affirm.

FACTS AND PROCEDURAL BACKGROUND

The appellant is the father of two boys: L.B., who was born in March 2013, and L.J., who was born in April 2014. We rely for the following factual background largely on findings of fact entered following the termination trial that the father does not challenge. Unchallenged findings are verities on appeal. *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

In October 2015, L.B., then 2½ years old; L.J., then 18 months old; and the then 4-year-old daughter of their mother, were removed from the home of their mother and the appellant. The family had been involved with the Department of Social and Health Services (Department) through a voluntary services program for several months before the dependency petition was filed and the children were removed.

The father entered into an agreed dependency for his sons in March 2016. He agreed to complete a chemical dependency evaluation, a parenting assessment, and a psychological evaluation; participate in random drug testing; continue mental health treatment; complete domestic violence offender treatment; complete family therapy; and

maintain a clean, safe, nurturing, stable and drug/alcohol free home environment on a consistent basis.

At the time he entered into the dependency, the father, a convicted felon, was under Department of Corrections (DOC) supervision that had begun in June 2015. Seven of his prior convictions had been for domestic violence charges. Some of the treatment ordered in the dependency overlapped conditions of his community custody. In addition to standard probation conditions, he was required by his supervision to complete domestic violence and mental health evaluations, submit to UA[2] testing, and was prohibited from using or possessing illegal substances.

Before entering into the agreed dependency, the father began attending mental health counseling at Frontier Behavioral Health in December 2015. He attended only two sessions. When he failed to appear for five other appointments, he was discharged as a patient.

On January 20, 2016, the parents completed a parenting assessment with Linda Wirtz, who recommended that the father participate in a fatherhood class, complete an anger management evaluation and domestic violence treatment, and that he engage in mental health treatment and family therapy with his sons.

---

[2] Urinalysis.

In mid-March 2016, the father briefly attended a single individual family therapy appointment with Jasmine Jordan, a family therapist. She discharged him after the first visit based on safety concerns: he smelled of alcohol and was aggressive and disruptive.

He then engaged in counseling and family therapy with Dave Smith beginning in late August or early September 2016. Counseling with Mr. Smith went better. Nevertheless, because the dependency petition had been filed almost a year earlier, the children had been removed from the custody of the parents for over six months, and the father had not participated in most services, the Department filed a petition to terminate his parental rights in September 2016.

While the father had been sentenced to only 12 months' probation, his time was tolled when he was on abscond status or was incarcerated on a non-DOC matter. As a result, he did not complete probation until November 2016. He never completed the DOC-required evaluations, and his UA results were often positive for methamphetamine.

As 2016 drew to an end and counseling with Dave Smith continued to go well, an attempt was made to increase the time the boys spent with their father from two hours a week to four. Unfortunately, the increase in visits was emotionally disruptive for L.B. and L.J., and they began to exhibit extreme changes in behavior. L.B. had night terrors and cried frequently. L.J. was waking up in the middle of the night and scavenging for food; he was taking off his diaper and smearing feces on himself and the room. Because

4

the behavior was at the risk of disrupting placement, the Department obtained an order suspending visitation with the father in December 2016.

At about the same time, the father finally completed the domestic violence assessment required by both DOC and his dispositional order. He was ordered to complete a year of treatment. He eventually attended only 7 of 20 required classes, dropping out in mid-April 2017. This concerned the domestic violence counselor who had assessed him, because the father's history of violence, including domestic violence, demonstrated that he needed to develop "tools in order to proceed and help him be involved appropriately within the family environment." Sealed Report of Proceedings (SRP) at 331.

The father completed a neuropsychological evaluation in January 2017 and was diagnosed with borderline intellectual functioning as well as a personality disorder with paranoid, antisocial, turbulent, and narcissistic traits. He was found to have difficulty controlling his emotions. The clinical psychologist who performed the evaluation concluded that in light of his diagnosis and the father's substance use, the prognosis for the father's ability to parent was "guarded." SRP at 249.

By the time the deterioration in the boys' behavior that caused visitation to be suspended in December 2016 had stabilized, Mr. Smith was no longer a contract provider to the Department. The father and his sons renewed family therapy in February 2017

with Renee Brecht. Family therapy with Ms. Brecht went well in a key respect: progress was made in the relationship between the father, L.B., and L.J. But the father was not making progress on changes to his lifestyle that he recognized needed to be made. He acknowledged to Ms. Brecht that he needed to deal with his use of substances, needed appropriate and suitable housing, and needed to have better supports.

The father was often homeless during the dependency. He was admitted to Revival House, a clean and sober living facility, but he was evicted after approximately six months for drinking alcohol and smoking marijuana. Because he has a history of being evicted from housing, his housing options are severely limited.

Termination trial

The termination trial was scheduled to begin on June 26, 2017. On May 16, 2017, the boys were moved to an emergency placement after one of the boys hit a foster sibling in the face. The next month, on June 6, their mother moved the trial court to place the boys with her relatives, Brandon and Shawntae Croson.

Ten days later and 10 days before trial, the parents jointly moved the trial court for a continuance to explore placement with the Crosons. The Crosons had been proposed to the Department as a placement roughly a year earlier, in June 2016. According to the assistant attorney general representing the Department, the Crosons indicated some interest in having the children placed with them, but they "failed to follow through with

background checks and—and any of the other information the Department needed to consider them for placement." SRP at 18.

The Department opposed the continuance, arguing that the boys needed permanence and stability. While acknowledging that the boys had recently been put in a sixth placement, it argued that the new placement was not an unknown family. The placement was with "the children of th[e previous] foster parent, the adult children that are now the current placement. So they had known [the boys] for quite some time. . . . They had been approved by the Department long ago, so—and they still maintain a relationship with their former foster family. They get to see their former foster mother and so forth. So it's not a sudden change of a brand-new family." SRP at 19-20.

The trial court denied the continuance request, observing that "these kids keep growing" and "something's got to give here." SRP at 29. It did not rule out the possibility that "something can be worked out, some kind of negotiation," but it left the matter on for trial beginning on June 26. *Id.* Evidence was presented on June 26th, continued on the 28th, and was completed on July 10th.

Over the three days of trial, the Department called 15 witnesses. Among them were social workers, assessment and treatment providers, the father's community custody officer, and the children's guardian ad litem. The Department's witnesses testified to the offer of services outlined above and to the father's failure to follow through on most of

7

the services offered. They testified among other matters to his untreated substance abuse issues, his inadequately addressed problems with domestic violence, and his failure to obtain and maintain stable housing.

The mother's parental rights were also at issue in the trial. At the conclusion of the State's case, she stipulated to the termination of her parental rights. As her lawyer explained, the mother concluded that her rights would be terminated and she wanted to preserve an open adoption agreement she had reached with the Department.

The father testified in his own behalf. He admitted to continued use of marijuana and alcohol. He conceded he had no ability to provide basic necessities to his sons and admitted that the boys' and their half sister's disclosures of a traumatic home environment were accurate. He acknowledged wanting to make changes but not doing so during the almost two years the dependency case was open, and identified no plan for how to be successful in the future. He did propose a plan for drug treatment, testifying that a "couple days" earlier, he had spoken to someone from a long-term (18 month) residential drug treatment program for men in Seattle that allowed patients to bring their children. SRP at 533. He testified that the woman he spoke to told him that all he needed to do was have someone fax her an assessment "and then we take it from there." SRP at 533. He had not obtained the assessment yet, but intended to do it "as . . . soon as . . . we don't have court tomorrow." SRP at 534. When the lawyers delivered their

8

closing arguments on July 10, the father's lawyer represented that after testifying, the father had obtained a chemical dependency assessment, and the Seattle residential drug treatment program was "ready to admit him." SRP at 566. He informed the court that the program would allow L.B. and L.J. to be placed with the father after he had completed 90 days' worth of treatment.

What proved to be of greatest concern to the trial court was the testimony of Carol Thomas, who provided individual therapy to L.B. and L.J. beginning in April 2017, a few months after she began providing therapy to their half sister. Ms. Thomas testified that in therapy the half sister described the father's involvement in the domestic violence in the home and told Ms. Thomas that she regularly saw the boys' father and her mother having sex. She also said that the boys' father had sexually assaulted her.

Ms. Thomas described L.B. as having continually struggled with "a lot of confusion and grief" and as missing earlier foster parents and his half sister, because she had been the one who took care of him. SRP at 289. He described hiding from the domestic violence that had taken place when he was living with his father and mother. He struggled "back and forth" between wanting to see his father or not. SRP at 293.

She testified that the boys struggled with trust, because for them, "people just disappear, people don't want to be their mom anymore or people don't want them." SRP at 293-94. She recommended not moving the boys again, because "it's taken its toll. . . .

9

[T]hey're not trusting permanence and they're not understanding why they keep losing people." SRP at 301. In response to trial court questioning, Ms. Thomas expressed the view that it is possible for children as young as L.B. and L.J. to process their traumatic experiences, but "now is the time to deal with it." SRP at 322.

After taking the matter under advisement, the trial court reconvened the parties after a few days and announced its decision to terminate the father's parental rights. Because the father's principal argument on appeal centers on undisputed testimony that the two hour a week therapy sessions revealed the affection between the father and his sons, we quote at length the trial court's explanation why this was not enough:

> [W]e'll never know exactly what went on in that home. But from what [their half sister] explains—and these boys were 1 and 2 when they were removed from the home, and so their ability to verbalize is not going to be very good. But [their half sister] has shed a lot of light upon what has happened in the home. It's undoubtedly clear that the boys have been traumatized so much so that their placements have had to be changed, because they couldn't be managed. And I think most significant for me was Carol Thomas. I asked her a couple questions, and she said, "You know, if we can stabilize these boys now, they can process anything they've gone through and they can grow up to be solid good men." But she also says that another loss for these boys would really take a devastating toll on them.
> So again, what she's saying is that these boys, just like any other child, need stability. They need to know that when they get up in the morning they're going to have breakfast. They need to know that things are expected of them, that after breakfast they're going to do X, Y, Z and that Mom or Dad or somebody, whoever their care provider is, is going to be there; that they're not going to have to fend for themselves or have their 5-year-old sister taking care of them. Stability is what these boys need, particularly these boys.

10

No. 35632-9-III (consol. w/ 35633-7-III)
*In re Parental Rights to L.J.*

SRP at 588-89.

The court acknowledged that the father had identified a residential drug treatment

program where L.B. and L.J. could be transferred to reside with him. But the court

observed, emphatically, that the residential treatment program was not a realistic solution.

It expressed its view that having L.B. and L.J. uprooted from Spokane after 90 days and

placed with their father full time in Seattle would be traumatic for them, noting that it

took only increased visitation with the father the prior December to cause severe

deterioration in their stability and behavior. The court continued:

> [The father] finds himself in the unenviable situation of having a rough life.
> He's had a rough upbringing, he's had a rough life, he's homeless, he's got
> some mental health issues, he's got some drug-and-alcohol issues. Do I
> want to penalize him for the situation that he finds himself in? Absolutely
> not. But realistically speaking, what I think about here and is of paramount
> importance to me are these boys.
>     For whatever reason, [the father] continues—and he's very candid
> with me. He's very candid—he continues to smoke marijuana and he
> continues to drink alcohol because life is hard and that's the only way you
> can cope with life sometimes. And I get that. The difficulty with that . . .
> is that when you drink and you smoke pot, all bets are off with regard to
> domestic violence, all bets are off with putting your kids first.
>     There's no plan for how to support these boys, how to clothe them,
> how to feed them, how to house them. [The father] acknowledged that
> what the kids saw and related was all true and that he was relieved actually
> when CPS removed these kids. I can't—that amount of disclosure doesn't
> get any better, because there's a realization of what was going on. But it's
> the ability to control that environment for the sake of the boys that is
> lacking.
>     . . . .
>     So as we sit here today, there's no plan, there's—[the father] does
> not have a plan for how he's going to care for these boys. So I'm going to
> make a finding that continuation of this parent-child relationship diminishes

11

their prospects for early integration into a stable and permanent home.  The
best predictor of what a person will do in the future is frankly what they've
done in the past.

SRP at 590-92.  Addressing the father, the court said:

> And understand, . . . I could give a hoot about your criminal history.
> It doesn't—I don't care about it.  It's what happened in the lives of these
> children that matters.  And I can't—they were such a tender age.  Not that
> it's great at any time, but they were so young that this is—the only chance
> we're going to have with them is to keep them stable, which I frankly don't
> believe that you are equipped to give them.
>
> Again, I know [you have] had a rough—rough life.  And you have,
> you had, the ability to change.  You're not 18, you're not 25.  You're 40?
> 41?  You're 40.
>
> [THE FATHER]: (Moved head up and down.)
>
> THE COURT: So this is the lifestyle that you adopted, and it's not
> clear to me whether or not you're motivated to change.  It's not my
> business at this particular point in time.  All I was looking for is something
> in the past 24 months that—that isn't—wasn't there.

SRP at 592.

The father appeals.

## ANALYSIS

The father's first two assignments of error are based on the trial court's denial of

his and the mother's request for a continuance to explore relative placement.  We address

the refusal of the continuance before turning to the father's challenges to the trial court's

findings following the termination trial.

12

I.     MOTION TO CONTINUE TRIAL

The father argues that the trial court's denial of the parents' continuance request violated his right to due process and deprived him of the effective representation of counsel.

It is well settled that in both criminal and civil cases, a trial court's decision to grant or deny a continuance is reviewed for a manifest abuse of discretion. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). In exercising discretion to grant or deny a continuance, trial courts may consider many factors, including surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure. *Id.* at 273 (citing *State v. Eller*, 84 Wn.2d 90, 95, 524 P.2d 242 (1974); RCW 10.46.080;[3] CrR 3.3(f).[4]

---

[3] RCW 10.46.080 provides:

A continuance may be granted in any case on the ground of the absence of evidence on the motion of the defendant supported by affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it; and also the name and place of residence of the witness or witnesses; and the substance of the evidence expected to be obtained, and if the prosecuting attorney admit [sic] that such evidence would be given, and that it be considered as actually given on the trial or offered and overruled as improper the continuance shall not be granted.

[4] Authorizing the court to grant continuances based on written agreement of the parties or "when . . . required in the administration of justice," so long as the defendant will not be prejudiced in the presentation of his or her defense. CrR 3.3(f)(2).

*A. Due process*

"[F]ailure to grant a continuance may deprive a defendant of a fair trial and due process of law, within the circumstances of a particular case." *State v. Williams*, 84 Wn.2d 853, 855, 529 P.2d 1088 (1975) (citing *State v. Cadena*, 74 Wn.2d 185, 443 P.2d 826 (1968)). "Whether the denial of a continuance rises to the level of a constitutional violation requires a case by case inquiry." *Downing*, 151 Wn.2d at 275 (citing *Eller*, 84 Wn.2d at 96).

In arguing that denial of his request for a continuance amounted to a due process violation, the father likens his request for a continuance to the facts of *In re Welfare of R.H.*, 176 Wn. App. 419, 309 P.3d 620 (2013). In that case, the Department had petitioned in October 2011 to terminate the parental rights of Bobby Adolphus. By January 2012, the children's aunt had come forward as a potential guardian. When it appeared the Department's completion of a required home study of the aunt might not be completed in time for the May 3, 2012 trial, Mr. Adolphus moved on April 5 for a continuance or to expedite the home study. The trial court denied the motion, accepting the Department's argument that whether the children would be placed with their aunt was immaterial to whether the State could prove a basis for termination at trial.

The court was required in *R.H.* to address whether guardian legislation enacted in 2010 was relevant to any factor the State was required to prove to support termination.

With the 2010 legislation, "the legislature [had] created a 'more flexible alternative to parental termination—guardianship under RCW 13.36.040.'" 176 Wn. App. at 423. *R.H.* holds that an impending guardianship is material to the State's burden of proving that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home," a termination factor provided by RCW 13.34.180(f) (discussed further below). *Id.* at 428.

The stated holding in *R.H.* is that "an *identified* guardianship" is material to this determination. *Id.* at 423 (emphasis added). Elsewhere, the court observed that "the potential for a guardianship placement had been established for four months prior to the termination trial and the State had completed the necessary background check and was in the process of approving the aunt for guardianship placement." *Id.* at 429. Subsequent decisions have made clear that "*R.H.* does not hold that a trial court's refusal to continue a termination trial to allow a parent to explore the *possibility* of a guardianship is per se a manifest abuse of discretion." *In re Welfare of N.M.*, 184 Wn. App. 665, 674, 346 P.3d 762 (2014). "*R.H.* stressed the need for an 'identified guardianship,'" and "[a]n 'identified guardianship' requires, at a minimum, an identified guardian." *Id.* Given the facts deemed material in *R.H.*, before implicating a due process right, the "identified guardian" (or, as here, a relative placement) must have offered to serve, submitted to the approval process, and have a realistic prospect for approval. Where there is no identified

15

guardian, the standard applied to denial of a continuance is the usual abuse of discretion standard.

The father does not demonstrate an abuse of discretion by the trial court. Dependency proceedings had been commenced almost two years earlier, and the children had been out of the father's home during that time. The Department had petitioned to terminate his parental rights almost a year earlier. The Crosons had taken no action to be approved for placement; there was no evidence that they had a good chance of being approved for placement; and there was no evidence they were even currently willing to have L.B. and L.J. placed with them.

### B. Ineffective assistance of counsel

The father makes a novel alternative argument that when the trial court denied his motion to continue, it rendered his trial lawyer ineffective. No authority is cited for the proposition that a trial court's action can render a lawyer ineffective. The closest we can come (and it is not close) is Washington case law holding that for a court to *grant* a motion to continue a *criminal trial* violates a defendant's constitutional rights if it forces the defendant to choose between the right to a speedy trial and the right to be represented by counsel who has sufficient opportunity to prepare a defense. *E.g.*, *State v. Sherman*, 59 Wn. App. 763, 769-70, 801 P.2d 274 (1990). Reversible error exists in those cases not

16

because the lawyer provides ineffective assistance, but because the trial court erred in putting the criminal defendant to the choice.

Applying the *Strickland*[5] standard for effective representation, a plaintiff asserting ineffective assistance of counsel must show deficient performance and resulting prejudice. *In re Dependency of S.M.H.*, 128 Wn. App. 45, 61, 115 P.3d 990 (2005) (citing *State v. Turner*, 143 Wn.2d 715, 730, 23 P.3d 499 (2001) and *Strickland*, 466 U.S. at 694). "Counsel's performance is deficient if it falls 'below an objective standard of reasonableness based on consideration of all the circumstances.'" *Id.* at 61 (quoting *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987)). To demonstrate prejudice, a party must show that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Thomas*, 109 Wn.2d at 226 (quoting *Strickland*, 466 U.S. at 694).

The father does not articulate any respect in which his trial lawyer's performance was deficient. He does not articulate how, but for his lawyer's performance, the result of

---

[5] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). We recognize there is an unsettled question of whether a less stringent standard for what constitutes "effective" representation applies in proceedings under chapter 13.34 RCW. *See, e.g.*, *In re Welfare of J.M.*, 130 Wn. App. 912, 920, 125 P.3d 245 (2005) (discussing the different, due process standard applied in *In re Moseley*, 34 Wn. App. 179, 184, 660 P.2d 315 (1983)). We give the father the benefit of the doubt by applying *Strickland*'s higher standard for effective representation.

the proceeding would have been different.  No basis for reversing the trial court's refusal to continue trial is shown.

II.     TERMINATION DECISION

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."  *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).  Because parents have a fundamental liberty interest in the custody and care of their children, the State may terminate parental rights "'only for the most powerful [of] reasons.'"  *In re Welfare of S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).  A parent has a due process right not to have the State terminate his or her relationship with a natural child in the absence of an express or implied finding that he or she, at the time of trial, is currently unfit to parent the child.  *In re Welfare of A.B.*, 168 Wn.2d 908, 918, 232 P.3d 1104 (2010) (citing *Santosky*, 455 U.S. at 760).  Current parental unfitness must be demonstrated by at least clear and convincing evidence.  *Id.* at 919 (citing *Santosky*, 455 U.S. at 769).  The father's first challenge to the trial court's termination of his parental rights is that the State did not make the required showing of his current parental unfitness.

*A. Current parental unfitness*

Washington statutes provide a two-step process before a court may terminate parental rights.

The first step requires that the State prove six statutory termination factors.[6] This first step "focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence." *A.B.*, 168 Wn.2d at 911 (footnote omitted). Satisfying all six of the statutory elements raises an implied finding of current parental unfitness. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75 (2016).

The father explicitly concedes in his briefing that the State proved the first five termination factors. As for the sixth—that "[c]ontinuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a permanent and stable

---

[6] The six elements appear at RCW 13.34.180(1)(a)-(f):
(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
(d) That the services ordered [to be provided to the parent] have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and
(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

home"—the father does not concede it in his briefing but does not assign error to the trial court's finding that it was proved, making it a verity on appeal. Sealed Clerk's Papers (SCP) at 121 (Finding of Fact (FF) VIII). Since this is the termination factor to which evidence of an impending placement with the Crosons would have been material, we understand why the father would not explicitly concede it in his briefing despite knowing it was proved at trial.

The father thus effectively concedes the State's proof at trial of all six termination factors. Yet he still challenges the trial court's finding that he is currently unfit to parent.[7] This ignores *In re Dependency of K.R.*, 128 Wn.2d 129, 141-42, 904 P.2d 1132 (1995), in which our Supreme Court held that if a trial court finds all six termination factors, it has implicitly found current parental unfitness. In *A.B.*, the court addressed whether this holding of *K.R.* "*always*, or only *sometimes*, permits an appellate court to

---

[7] That finding states in its entirety:

> The parent(s) is currently unfit to parent the child. The father admits to continued use of marijuana and alcohol. He [h]as no ability to provide basic necessities to the boys and admits that the children's disclosures of a traumatic home environment were accurate. The father acknowledges wanting to make changes, but has been unable to do so during the two years the dependency case has been open, and has no plan for how to be successful in the future. Even if the father participates in chemical dependency treatment on the west side of the state, it would be far too disruptive and traumatic for the children to be removed from their current homes and placed in a strange facility.

SCP at 121 (FF VII).

imply or infer a finding of current parental unfitness." 168 Wn.2d at 921. It held that a finding of the six factors is always substantively sufficient; its issue is only whether the trial court *intended* to find current parental unfitness. *Id.* (an appellate court can infer the omitted finding "if—but only if," it is clear from the record that the omitted finding "was actually intended, and thus made, by the trial court"). The trial court in this case made an explicit finding of parental unfitness, so its intent is clear. Because the finding of the six termination factors is sufficient to establish current parental unfitness and the court explicitly found parental unfitness, no further analysis is required.

*B. Best interests of the child*

The second step in a trial court's decision whether to terminate parental rights is for the court to ascertain the best interests of the child. RCW 13.34.190. "Because the parent's rights will already have been observed in the first step, this second step need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 912.

The father assigns error to the trial court's finding that termination was in L.B.'s and L.J.'s best interest, which it explained in its finding IX:

> It is in the child's best interests to terminate the parent-child relationship. The children experienced significant trauma while in the care of their parents. Their parents were physically and emotionally unavailable to them and the boys were left to fend for themselves. There was often no food in the house and they witnessed domestic violence and explicit sexual activity between their parents. Both children exhibited extreme behavioral disruptions, anxiety, anger, and aggression. They have had multiple placements and suffered several losses as a result. It is critical that the children are provided a safe, permanent home with consistent caregivers.

21

SCP at 122.

If substantial evidence supports the trial court's finding in light of the preponderance of evidence standard that applies, the order terminating parental rights must be affirmed. *In re Dependency of T.R.*, 108 Wn. App. 149, 160-61, 29 P.3d 1275 (2001). "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" *K.M.M.*, 186 Wn.2d at 477 (quoting *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)). We defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence. *Id.*

"Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period'" while the parent seeks to rehabilitate himself. *T.R.*, 108 Wn. App. at 167 (alteration in original) (quoting *In re A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)). It is always easier for a trial court to make the "best interests" finding, and for us to affirm it, when a parent has forgone visitation and family therapy, showing no real bond with his child, so the affection between the father and his sons weighs against the finding here. Many other facts strongly support the finding, however. Substantial evidence supports the trial court's finding that the best interests of L.B. and L.J. required much more than a father who was a loving parent in two-hour-a-week visits.

No. 35632-9-III (consol. w/ 35633-7-III)
*In re Parental Rights to L.J.*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Korsmo, J.

23