IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of C.W. | No. 80856-7-I |
| DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, | DIVISION ONE |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| JOHNATHAN RAY WEIDENAAR, | |
| Appellant. | |

SMITH, J. — Johnathan Weidenaar, C.W.'s father, appeals the trial court's order that found the child dependent pursuant to RCW 13.34.030(6)(c). He also appeals a disposition order regarding the child's out-of-home placement. The child's mother did not appeal either order. The father asserts that there is insufficient evidence to support the finding of dependency. He contends the trial court erred in allowing C.W.'s primary pediatrician to testify, over the parents' hearsay objection, about the meconium test results, which indicated the presence of methamphetamine and amphetamine in the baby's first stool, as statements for medical diagnosis or treatment under ER 803(a)(4). He further contends that there is not clear, cogent, and convincing evidence of a manifest danger to support the child's out-of-home placement. Substantial evidence supports the finding that

Citations and pin cites are based on the Westlaw online version of the cited material.

C.W. had no parent capable of adequately caring for him such that he was in circumstances constituting a danger of substantial damage to his psychological or physical development. The father fails to show an abuse of discretion in the trial court's evidentiary and placement decisions. Therefore, we affirm.

FACTS

Melissa Creelman gave birth to C.W. on June 14, 2019. He was four months old at the time of the dependency trial in October 2019. At issue is the father's ability to adequately care for the child and the child's out-of-home placement.

The family lived in a 30-foot fifth wheel trailer they had converted to a "tiny home." They lived there with the father's 16-year-old daughter. The parents had lived together for 10 years while both remained married to other people. The father has a criminal history, including 10 convictions for driving with license suspended in the third degree. Although he did not have a valid driver's license, he continued to drive. The mother had a conviction for driving under the influence from 2012. At the time of the trial, she had an active arrest warrant for driving without an ignition interlock and asserted her Fifth Amendment privilege against self-incrimination.

On June 11, 2019, three days before C.W.'s birth, the mother went to PeaceHealth St. Joseph Medical Center believing she was in labor. The mother had not sought prenatal care. She explained that she did not know she was pregnant until late in her pregnancy, had gone to one visit, and felt shamed by a doctor, so she did not return. She denied drug use, but her urine test returned

2

positive for methamphetamine and amphetamine. The father testified he was not concerned about the result because the mother had denied drug use, and he believed her. C.W.'s urine was negative for all substances. The baby's meconium sample (first stool) was collected for a drug screen analysis to determine if he had been exposed to any substances in utero or shortly after birth. The hospital placed a hold on the baby's discharge.

On the day of C.W.'s birth, the Department of Children, Youth, and Families (Department) received a child protection intake from the hospital, and Kelly Adams began an investigation. When visiting the parents at the hospital, Adams observed the mother co-sleep with the baby multiple times, even after the mother had been repeatedly advised not to do so. C.W.'s primary pediatrician, Dr. Peter Filuk, testified that he would advise against co-sleeping, consistent with the American Academy of Pediatrics, because co-sleeping poses a risk of suffocation. The doctor explained that an infant could suffocate from slipping or sliding against a pillow or an item of bedding or a parent or the infant rolling against each other. The mother acknowledged she had been told not to co-sleep with C.W. and had watched a video explaining the risks of co-sleeping. She testified she learned "[t]hat it is dangerous if you sleep with your baby in the bed" because you "can fall asleep and smother your baby." But she did not agree with that opinion. The father was also aware of the risks of co-sleeping including suffocation but testified that "people are entitled to their opinion," and "unfortunate things happen all the time."

Four days later, on June 18, 2019, Adams conducted a family team

3

decision-making meeting at the hospital with the parents, a social worker from the hospital, and Adams' supervisor. Adams explained to the parents that they were still waiting for C.W.'s meconium test results. As part of the plan developed at the meeting, the parents agreed to provide ongoing UAs (urinalyses) for four weeks and not co-sleep with the baby. On June 19, 2019, after the parents provided one clean UA, the hospital discharged C.W. to the parents.

After C.W.'s discharge, Adams used multiple ways to communicate with the parents and inform them of services and UAs. Adams used text messages at the numbers the parents provided, and she confirmed the accuracy of the numbers by the parents' responses to her messages. She also mailed letters at the address the parents provided and went to the family home and left notices at the door. The letters advised the parents that they would be considered to have a positive UA if they failed to appear for a UA as scheduled or failed to provide a sufficient amount of urine or if their urine was found diluted, adulterated, or outside of any normal range. The parents never indicated they did not understand the process. But they did not attend any further UAs until the shelter care hearing. The mother testified at trial that she only agreed to do one UA before the discharge, and "[t]hat was it." She testified she did not attend further UAs because she did not want to. The father testified he understood to do one UA, and "there would be one more to follow, I guess, later."

Meanwhile, Dr. Filuk learned of the baby's meconium test results, which were positive for methamphetamine and amphetamine. At trial, Dr. Filuk was allowed to testify, over the parents' hearsay objection, about the test results as

4

statements for purposes of medical diagnosis or treatment pursuant to ER 803(a)(4).

Dr. Filuk was concerned about the positive meconium test results and explained the "broad reaching" risks. The doctor explained that infants exposed to methamphetamine or amphetamine could develop growth problems, cognitive issues (including learning disabilities and memory problems), and issues regulating their own body (including temperature instability, sleep, and sensory issues). He testified that an infant born exposed to drugs in utero would require additional screening or check-ups above and beyond routine well-child checks. He testified that in light of the "long-term effects," the parents needed to be diligent and "on the lookout for anything else that could be out of the ordinary." He testified that parents' drug use impairment would cause an additional risk to the infant. Dr. Filuk testified that C.W. would need "some form of evaluation for learning developmental assessment in the future."

The Department learned of C.W.'s positive meconium test results. Adams was concerned about the results and the parents' lack of participation in UAs.

On July 3, 2019, the Department filed a dependency petition for C.W. and obtained a court order to take the child into custody. The next day, July 4, a social worker visited the family home to serve the dependency petition and pick up the baby. But the mother and the baby were absent, and the father said they had gone camping. The father said he did not know where they were. He later testified, "I specifically asked not to be told where they were going." He said, "[W]hat you don't know can't hurt you." The mother testified she was camping with her friends in

5

eastern Washington where cell phone services were "very, very poor." The father testified he was not concerned about C.W., just two and a half weeks old, being on a camping trip in an area without cell phone service. He testified, "[T]hey have a vehicle that got them there. I'm sure they can go get service somewhere." He testified he was not concerned about the mother's ability to care for C.W. "because she has two other children that aren't dead." He testified, "Melissa is competent. She's not a risk taking person." The Department obtained a writ of habeas corpus for law enforcement assistance to take C.W. into custody.

Whatcom County sheriff's deputies went to the family home every day, sometimes multiple times per day, over the course of 10 days to locate and take C.W. into custody. The father testified that "the cops . . . showed up relentlessly like a bunch of assholes, because that's what they were." There were several buildings on the parents' property along with their fifth wheel trailer. Adams suspected that the family was hiding in one of the buildings.

The mother testified she had been camping for about eight to nine days and called the father on July 12 to learn the sheriff was looking for the baby. She testified she returned home with C.W. on July 13. The parents knew there was a court order requiring them to turn C.W. over to law enforcement, but they planned a dinner with their older daughters. The mother testified that sheriff's deputies arrived at their property prior to dinner.

Whatcom County Deputy Sheriff Mason Stafford testified about what happened when he and other deputies took C.W. into custody on July 13. The deputies knocked on the door of what appeared to be the main residence several

6

times and announced their presence but received no response. As allowed by the writ, the deputies entered and searched the building but did not locate C.W. there. The deputies continued to search the property, including an "open air building like a covered storage area," and located another building to the eastern end of the property and saw some diapers outside. Through an open kitchen window, they saw baby formula. They began knocking on the door of the building, announcing their presence. They did so for about 20 minutes. It was about 8 p.m. The area was cluttered with lots of garbage and items stacked outside the door. The parents finally opened the door and came out. The deputies entered the building and found C.W. inside.

The father testified that the building in which C.W. was found was about 60 to 80 yards from the fifth wheel in which they normally lived. He testified the family was in that building because it was a hot evening with "a hundred degrees out" and the building had air-conditioning. But the mother testified that outside temperature was probably in the "upper 70s." Deputy Stafford testified it was a comfortable evening with temperature probably in the 60s. The father later testified, "A hundred degrees, 80 degrees, I couldn't specifically say." He testified he was asleep when the officers arrived and knocked on the door. The mother testified she was taking a nap and "woke up to sheriffs screaming and pounding on the doors."

Deputy Stafford recorded a walk-through video of the property and the interior of the building where C.W. was located. The deputy noted "quite a bit of clutter" on the kitchen counters and floor and what appeared to be groceries on

7

the floor. The sink was full of dishes, some with mold, and did not appear to be "a fresh mess." The deputies took C.W. into custody and notified the Department. Adams took C.W. to an emergency room for a check-up. C.W. was found in good health.

On July 17, 2019, the trial court conducted a shelter care hearing. At the hearing, both parents agreed and were ordered to participate in services, including random UAs. The court placed C.W. in licensed foster care pending trial but allowed the baby to be placed with the parents if they submitted to a UA that day and another UA within a week and both were clean. C.W. did not return home and remained in out-of-home placement.

Shortly after the shelter care hearing, Adams conducted a case conference and advised the parents they needed to attend UAs in order to get C.W. back, and they indicated they understood. But concerns arose that the parents might be tampering with the UAs. On July 31, 2019, the parents admitted having used fake urine. They admitted they bought "fake pee" (synthetic urine) at a store and used it as their urine. The mother testified she falsified her UA only once and did so because she understood her UAs "needed to be 100 percent clean of any substance." She testified she was using marijuana topically on her skin and worried her UA would show marijuana. The father testified he used fake urine twice because he was "worried about cannabis." He testified he smoked marijuana occasionally and "came up with the idea of being able to medicinally use it in the form of a topical situation." He asserted he had a prescription from a naturopath.

8

From the date of the shelter care hearing until the trial in October 2019, the Department referred the parents for seven UAs, but the mother completed only one, and the father none. The mother admitted missing two UAs during the two weeks before trial but denied failing to appear for a number of UAs. The father admitted missing some UAs after the shelter care hearing.

C.W. reportedly choked when eating, and Dr. Filuk sought specialist consultations to evaluate his feeding. Three specialists evaluated C.W. and determined that he had swallowing issues that would require his caregivers to "be alert and aware" of the pace of the baby's feeding to prevent him from choking, coughing, or potentially aspirating. The issues required care above and beyond the needs of a normal newborn. Dr. Filuk referred C.W. to occupational, physical, and speech therapies. At the time of the trial, C.W. was engaged in those therapies. Dr. Filuk testified that C.W. has "higher than normal needs." The mother acknowledged that C.W. still had swallowing issues. But she testified C.W had no special needs that concerned her. The father likewise testified C.W. had no feeding problem or special needs.

In addition to the concerns about C.W.'s exposure to methamphetamine and amphetamine, co-sleeping, and swallowing issues, Dr. Filuk identified other risk factors, including the mother's late prenatal care and C.W.'s loss of birth weight during the time he was in the parents' care from June 19 to July 13, 2019. The mother acknowledged that the baby had three medical appointments after his discharge from the hospital and that his weight dropped three times. The father testified that the weight loss was normal. Dr. Filuk explained that although every

9

newborn loses a certain amount of weight after birth, the loss of more than 10 percent within a specified period may be concerning. If an infant is doing well, it should have gained back any weight lost by two weeks of age. By June 27, 2019, two weeks after his birth, C.W.'s weight loss was 10 percent of his birth weight, raising concerns. On July 2, the baby's weight remained down. He had gained weight by the time he was taken into custody and placed in foster care on July 16.

Social worker Jacob Rodenberg testified that the parents still had not completed many of their UAs. The mother admitted she used marijuana the day before trial but denied any other drug use. The father denied the mother's drug use. He testified he used medicinal marijuana on occasions. Rodenberg testified that the parents were not currently capable of caring for C.W. He explained that there was a heightened concern for the safety of C.W. as an infant because infants are more vulnerable and need more supervision than older children. Adams likewise testified that C.W. had no parent capable of adequately caring for him at this time based on the parents' lack of participation in UAs to prove their sobriety. C.W.'s guardian ad litem (GAL), Martha Moore, also supported the child's dependency and testified that it was important for the parents to show consistent sobriety given the baby's positive meconium test for methamphetamine and amphetamine.

After a four-day trial, the trial court gave its oral ruling on October 25, 2019, finding that C.W. was dependent because he had no parent capable of adequately caring for him such that he was in circumstances constituting a danger of substantial damage to his psychological or physical development under

RCW 13.34.030(6)(c). The court found that the mother did use methamphetamine and/or amphetamine in the late stages of her pregnancy based on her positive urine test, which was corroborated by the baby's positive meconium test for the same drugs. Noting the mother's "decision to use methamphetamine so late in a pregnancy," the court concluded there was "a strong likelihood that the mother has a substance use problem that may interfere with her ability to adequately parent an infant." The court also found that both parents engaged in "continuing efforts to avoid supervision by the state, particularly with respect to the U.A. tests that they were requested to give." The court found the circumstances of the mother's "suspicious camping trip shortly after [C.W.'s] birth . . . compelling . . . that [the parents] were attempting to hide the child from the authorities at a time when the state was trying to supervise and make sure that he was safe." The court found "sufficient evidence . . . that both parents attempted to hide the child during that time when they knew the state was attempting to supervise them," which raised concerns "about their ability to adequately parent this child given his young age."

Pending disposition, the court ordered random UAs for the parents and allowed C.W. to return home as soon as the parents were able to show clean UAs. The court decided to enter a dependency order immediately, without waiting for proposed written findings, so the parents could show clean UAs and have C.W. back as soon as possible. The court stated, "My hope is that he goes home with you. You comply with these rules, and this child has some stability and starts to bond with you again at home. That's my hope."

On November 4, 2019, the court conducted a disposition hearing, which

was continued to November 8, 2019. The Department requested continued out-of-home placement for C.W., while the parents requested in-home dependency. At the November 4 hearing, social worker Rodenberg reported that the mother's UA had returned invalid for its high pH level. The father's UA was clean of all substances. Rodenberg understood that pH affects the validity of the test. For her next UA, the mother was unable to produce a sample. Both parents later provided UA samples, which had not been back at the time of the November 8 hearing. GAL Moore recommended out-of-home placement for C.W. because the parents had not established a pattern of sobriety. The court ordered C.W. remain in out-of-home care. The court ordered both parents to continue to participate in random UAs and a substance abuse evaluation. The court required that UAs "be free of all non-prescribed drugs, alcohol, including marijuana, and other illegal substances as well." The court's expectation was "no marijuana use, and that may change down the road once the substance abuse evaluation has been done." The father reported that two or three UAs were "on their way," and the court stated "if those come back clean, then the child should go home immediately." The court also ordered no co-sleeping.

Toward the end of the November 8 hearing, the mother disclosed that the family just had a fire, and "every other structure aside from the main house and our fifth wheel has burnt to the ground." The fire, which destroyed the buildings on the parents' property, occurred on November 1. The court stated that the Department could conduct a home visit before returning the child home. The parties were to work on a proposed disposition order for presentation to the court.

12

On November 21, 2019, the parties returned to court for presentation of the disposition order. The Department reported that the mother's UA from November 6 came back positive for methamphetamine and amphetamine. The Department also reported that the father had refused to allow a social worker to conduct a walk-through of the family's home on November 19. The father testified that he had locked the door and had lost his key when the social worker arrived for a walk-through, and the mother "wouldn't answer the door because she sleeps like a freaking rock." Asked whether the mother was sleeping so hard that knocking on the door or window would not wake her up, he testified, "[y]ou could knock on her head, and it wouldn't wake her up." The father testified he did not believe he or the mother had any substance abuse problem. GAL Moore reported that the parents did not disclose the November 1 fire in their communications with her on November 6, 2019. The GAL pointed out pictures of the damage to the property, with debris, propane tanks, and heavy metal equipment scattered over the ground. The GAL expressed concerns about the safety of the property as a viable living environment for C.W. as well as the parents' evasive answers regarding their housing situation and the mother's recent positive UA for methamphetamine.

The trial court reminded the parties that its concern was not just the evidence of drug use but "subterfuge . . . removing the child from anyplace where he could be supervised at such a young age, and, and falsifying U.A.s," which "indicated an inability to demonstrate sobriety." The court also noted a history of the parents' avoiding supervision and the father's inability to recognize what the mother was doing or decision to cover for her drug use. Because the court did not

13

include written findings in the dependency order, the court entered the following

findings in the disposition order:

> The mother has used methamphetamine or amphetamine during the late stages of her pregnancy, admitted to marijuana use, and made continuing efforts to avoid providing accurate UA testing, including by providing false UAs, therefore the court concludes she may have [a] substance abuse problem, impacting her ability to safely parent.
>
> The father has made continuing efforts to avoid providing accurate UA testing, including by providing false UAs, and admitted to marijuana use, therefore the court concludes he may have [a] substance abuse problem impacting his ability to safely parent.
>
> The evidence has shown that both parents made efforts to hide the child from the supervision and health and safety assessments of the State, despite a lawful court order to produce the child, impacting their ability to safely parent.

ANALYSIS

Dependency allows state intervention to remedy family problems and provide needed services. In re Dependency of Schermer, 161 Wn.2d 927, 942, 169 P.3d 452 (2007). Unlike a proceeding to terminate parental rights, dependency is a preliminary and remedial process that does not permanently deprive a parent of any rights. Schermer, 161 Wn.2d at 943.

A. Finding of Dependency

The father asserts that insufficient evidence supports the finding of dependency. To establish C.W.'s dependency, the Department had to prove by a preponderance of the evidence that the child meets one of the statutory definitions of dependent child as set forth in RCW 13.34.030(6). RCW 13.34.110(1). The trial court found C.W. dependent under RCW 13.34.030(6)(c), which defines dependent child as "any child who . . . [h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances

14

which constitute a danger of substantial damage to the child's psychological or physical development." The father challenges the sufficiency of evidence to support this finding. This court will uphold the trial court's factual findings if supported by substantial evidence. In re Dependency of M.P., 76 Wn. App. 87, 90, 882 P.2d 1180 (1994). Substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party below (here, the Department), a rational trier of fact could find the fact more likely than not to be true. M.P., 76 Wn. App. at 90-91. This court may not reweigh evidence or disturb the trial court's credibility determinations. M.P., 76 Wn. App. at 91.

The father assigns error to, but does not make any argument challenging, the following findings of fact related to the mother's substance abuse concerns:

> The mother has used methamphetamine or amphetamine during the late stages of her pregnancy, admitted to marijuana use, and made continuing efforts to avoid providing accurate UA testing, including by providing false UAs, therefore the court concludes she may have [a] substance abuse problem, impacting her ability to safely parent.

These findings are verities. See In re Welfare of L.N.B.-L., 157 Wn. App. 215, 243-44, 237 P.3d 944 (2010) ("An appellant waives an assignment of error when she presents no argument in support of the assigned error.").[1]

The father argues that substantial evidence does not support the trial court's finding that he may have a substance abuse problem. The trial court made the following findings related to the father's substance abuse concerns:

> The father has made continuing efforts to avoid providing accurate UA testing, including by providing false UAs, and admitted to marijuana use, therefore the court concludes he may have [a]

---

[1] In any event, substantial evidence supports these findings.

15

substance abuse problem impacting his ability to safely parent. The father argues that his admitted use of marijuana and use of fake urine for two UAs are insufficient to show a substance abuse problem when the Department did not show his use of marijuana or any other controlled substance in excessive amounts or for purposes other than medical treatment. He points out his testimony that he used marijuana medicinally with a card and used fake urine due to his concern that his medical marijuana use would result in a dirty UA. He also points out his clean UA shortly before C.W.'s discharge from the hospital and two additional clean UAs after the entry of the dependency order but shortly before the entry of the disposition order. But his argument is largely based on a view of the evidence in his favor, contrary to the substantial evidence standard of review, which requires this court to view all the evidence and draw all reasonable inferences from the evidence in the light most favorable to the Department. See M.P., 76 Wn. App. at 90-91. The evidence so viewed supports the trial court's finding that the father may have a substance abuse problem.

Before C.W.'s discharge from the hospital, the father agreed to attend ongoing UAs for four weeks but, after the discharge, refused to attend any of the UAs requested by the Department before the child's removal. Even after the shelter care hearing when he was ordered to attend random UAs, he missed some UAs. When confronted with suspected tampering with UAs, both parents admitted they bought and used "fake pee." Although the father asserted he had "a card" prescribed by a naturopath for medicinal marijuana use, the trial court was not required to accept his claim as true. A reasonable inference from the father's

16

admitted use of fake urine on multiple occasions and continued efforts to avoid providing accurate UAs, as shown by the evidence, is that he may have a substance abuse problem.

Citing In re Personal Restraint of Meippen, 193 Wn.2d 310, 316, 440 P.3d 978 (2019), the father argues that the finding that he "may have" a substance abuse problem is insufficient to prove dependency under the preponderance of the evidence standard, which requires proof "more likely than not." Meippen addressed a personal restraint petition asserting a constitutional error, and the court held the petitioner had prima facie burden of showing by a preponderance of the evidence that he was actually and substantially prejudiced by the error, not a "'*possibility* of prejudice.'" Meippen, 193 Wn.2d at 315-16 (internal quotation marks omitted) (quoting In re Pers. Restraint of Hagler, 97 Wn.2d 818, 825, 650 P.2d 1103 (1982)). Meippen did not address dependency under RCW 13.34.030(6)(c) and is inapposite. Further, the trial court's finding of dependency was not based solely on the evidence of the father's drug use but also on the parents' efforts to hide the child from supervision and safety assessments despite a court order requiring them to produce the child:

> The evidence has shown that both parents made efforts to hide the child from the supervision and health and safety assessments of the State, despite a lawful court order to produce the child, impacting their ability to safely parent.

In its oral ruling, the court elaborated on the parents' history of avoiding supervision, raising concerns about their ability to safely care for C.W.:

> The father indicates that he doesn't believe she's using methamphetamine, which indicates to me that either he doesn't, he

17

doesn't know what she's doing, or he's covering for her, and so I don't know which of those things it is, but either way, I'm concerned about his ability to adequately care for the child when, when he's unaware of the mother's activities, and that worries me.

I'm also worried about behavior in the past that there was testimony, too, at trial that he was clearly covering for the mother when she took the newborn child on a suspicious sort of camping trip where he didn't know where they were, and clearly, didn't want to know where they were so he wouldn't have to tell anyone where they were, and that was pretty much his testimony that if he didn't know, if couldn't hurt them. So I think that there's a history here of avoiding supervision and perhaps covering for the mother's drug use in order to try to get the child home, and that's on the part of the father.

The father does not argue that the evidence does not support the findings related to the parents' efforts to hide C.W. from the Department's supervision and safety assessments despite a lawful court order to produce the child. Rather, he argues the evidence does not show "a nexus between any alleged deficiency and parenting ability." He argues the evidence does not show C.W. was harmed by the parents' failure to turn him over to the Department because he was found healthy and drug-free when he was taken into custody.

But dependency under RCW 13.34.030(6)(c) "does not require proof of actual harm, only a 'danger' of harm." Schermer, 161 Wn.2d at 951. Nor does it turn on parental "unfitness" in the usual sense or misconduct. Schermer, 161 Wn.2d at 944. "Rather, it allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs." Schermer, 161 Wn.2d at 944. The trial court "has broad discretion in evaluating all of the evidence before it" and "'considerable flexibility to receive and evaluate all relevant evidence in reaching a decision that recognizes both the welfare of the child and parental rights.'" Schermer, 161 Wn.2d at 952 (quoting In

18

re Welfare of Becker, 87 Wn.2d 470, 477-78, 553 P.2d 1339 (1976)). On review, this court may look at "the constellation of facts presented in this case as a whole" to determine whether the father was capable of meeting C.W.'s needs and, if not, whether his inability posed a danger of harm to the child. Schermer, 161 Wn.2d at 952. The constellation of facts presented in this case viewed as a whole in the light most favorable to the Department supports the trial court's finding that the father was not capable of adequately caring for C.W. and that his inability posed a danger of substantial damage to the child's psychological or physical development.

The constellation of facts before the court was substantial. The mother did not seek prenatal care except for once. She continued to co-sleep with C.W. after having been repeatedly told not to do so, with knowledge of the risks of suffocation. The father, also being aware of the risks, minimized them, testifying that "people are entitled to their opinion" and "unfortunate things happen all the time." He was not concerned about the mother's positive urine test for methamphetamine and amphetamine because she told him she had not done any drugs. As discussed earlier, after the child's discharge from the hospital, the father refused to attend any UAs despite his agreement to do so. When a social worker went to the parents' home to serve the dependency petition and pick up the child, the father claimed the mother and C.W. had gone camping and that he did not know where they were. He claimed he "specifically asked to not be told where they were going." He said, "[W]hat you don't know can't hurt you." This was when C.W. was only two and a half weeks old, and his meconium test results had just returned positive for methamphetamine and amphetamine, consistent with the mother's positive

urine test for the same drugs. This was also when C.W.'s weight had dropped significantly, causing concerns.

The father testified he had no concern about C.W. being on a camping trip with the mother where no cell phone service was available. He claimed no concern about the mother's ability to care for C.W. "because she has two other children that aren't dead." When deputies finally found C.W. after nine days of the issuance of the writ of habeas corpus, the family were in a building 60 to 80 yards from the fifth wheel where they lived. The parents did not respond to the officers' "screaming and pounding on the doors" for 20 minutes at approximately 8 p.m. Despite their knowledge of the court order requiring them to produce C.W. to law enforcement, they planned a dinner with their older daughters and later claimed they were asleep when the officers arrived. After the child's removal, the parents were ordered to participate in random UAs but provided fake urine and failed to produce accurate UAs to show their sobriety.

Dr. Filuk identified the risks of harm to C.W., including the mother's late prenatal care, co-sleeping, C.W.'s loss of birth weight, and his exposure to methamphetamine or amphetamine. Among other things, Dr. Filuk explained the "broad reaching" risks and "long-term effects" from infants' exposure to methamphetamine or amphetamine, including growth issues, cognitive issues (e.g., learning disabilities and memory issues), and problems regulating their own body. Dr. Filuk testified that an infant born exposed to drugs would require additional screening or checkups above and beyond routine well-child checks and that the parents needed to be diligent and "on the lookout for anything else that

could be out of the ordinary." C.W. developed swallowing issues and was engaged in occupational, physical, and speech therapies. Dr. Filuk testified that the child's swallowing issues required his caregivers to "be alert and aware" of the pace of his feeding to prevent choking, coughing, or aspirating. Dr. Filuk testified that C.W. had "higher than normal needs." But both parents minimized the issues and claimed C.W. had no special needs that concerned them.

The evidence sufficiently supports the finding that C.W. had no parent capable of adequately caring for him such that he was in circumstances constituting a danger of substantial damage to his psychological or physical development. Substantial evidence supports the finding of dependency.

The father argues that he is a capable, loving, and skilled parent. But his argument largely relies on a view of the evidence in his favor and fails under the substantial evidence standard of review. See M.P., 76 Wn. App. at 90-91.

B. Meconium Test Results

The father argues that the trial court erred in admitting, over the parents' hearsay objection, the results of C.W.'s meconium test results through the testimony Dr. Filuk. The trial court initially sustained the parents' hearsay objection and allowed the testimony only for purposes of Dr. Filuk's opinion, not as substantive evidence. But the court later reviewed the parties' briefs and ruled that the test results as testified to by Dr. Filuk are admissible as statements made for purposes of medical diagnosis or treatment under ER 803(a)(4). The father challenges this ruling. The admission of relevant evidence is within the sound discretion of the trial court and will not be disturbed on appeal absent a manifest

21

abuse of discretion. State v. Swan, 114 Wn.2d 613, 658, 790 P.2d 610 (1990). A trial court abuses its discretion if its ruling is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. In re Dependency of T.L.G., 139 Wn. App. 1, 15, 156 P.3d 222 (2007).

ER 803(a)(4) creates a hearsay exception for "statements for purposes of medical diagnosis or treatment." ER 803(a)(4) (formatting omitted); In re Dependency of Penelope B., 104 Wn.2d 643, 656, 709 P.2d 1185 (1985). The rule provides as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> . . . .
> (4) . . . Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as *reasonably pertinent to diagnosis or treatment.*

ER 803(a)(4) (emphasis added). The father argues that ER 803(a)(4) does not apply to the meconium test results because the Department failed to show that the test results were "reasonably pertinent to diagnosis or treatment" under the rule.

"Generally, to establish reasonable pertinence (1) the declarant's motive in making the statement must be to promote treatment, and (2) the medical professional must have reasonably relied on the statement for purposes of treatment." In re Pers. Restraint of Grasso, 151 Wn.2d 1, 20, 84 P.3d 859 (2004). The father concedes that the Department "arguably established the second [reasonable reliance] prong" but argues that the Department "never addressed the first [motive] prong." But the Department did address the two-part test and argued

that C.W.'s meconium test results met the test. The father argues that Dr. Filuk "simply could not, and did not, establish the declarant's motive." We disagree.

This court has held that ER 803(a)(4) allowed a treating doctor, who ordered a computerized tomography scan for a patient's suspected fracture in the nose and possible other injuries, to testify about a radiologist's findings on the scan over a hearsay objection. State v. Doerflinger, 170 Wn. App. 650, 664-65, 285 P.3d 217 (2012). The court held the radiologist's findings were "without question . . . made for purposes of diagnosis and treatment; this was the precise purpose for which [the doctor] ordered the scan." Doerflinger, 170 Wn. App. at 664-65.

Citing In re Welfare of J.M., 130 Wn. App. 912, 125 P.3d 245 (2005), the father argues that an expert may not testify to another expert's opinions. His reliance on J.M. is misplaced. There, Division Three of this court held that the caseworker and the guardian ad litem should not have been allowed to testify about nontestifying psychological and mental health experts' hearsay opinions, including assessments, progress notes, and recommendations as substantive evidence. See J.M., 130 Wn. App. at 922-25. The court explained that ER 705 allows an expert's use of written reports of absent witnesses solely to show the grounds upon which the testifying expert's opinion is based and is not a mechanism to admit otherwise inadmissible evidence. J.M., 130 Wn. App. at 924-25. J.M. did not address ER 803(a)(4) and is factually distinguishable. This court's opinion in Doerflinger addressed ER 803(a)(4) and supports the trial court's decision here.

The record sufficiently shows that the declarant's motive in making the

statement (meconium test results) was to promote treatment. Although Dr. Filuk did not order the test, the record sufficiently shows it was ordered as part of C.W.'s newborn care for diagnosis and treatment. Dr. Filuk worked in a group of 15 to 18 pediatricians at PeaceHealth hospital, where C.W. was born and had his meconium test, and the doctors cross covered each other to ensure continuity of care. Dr. Filuk considered his colleagues in his group as his "partners . . . with cross-coverage." Although Dr. Filuk no longer provided inpatient care, other pediatricians in his group did so. When a newborn entered Dr. Filuk's care, he reviewed as much documentation as possible about the delivery and hospital stay, met and talked with the family, examined the child, and developed plans addressing any immediate problems and created a plan for well-child checks. The process helped inform Dr. Filuk's ongoing care and medical prognosis and was customary practice for all physicians in his group. The hospital's electronic records system connected inpatient and outpatient care, and Dr. Filuk, as C.W.'s primary treating pediatrician, was notified of the lab results of C.W.'s meconium test and was expected to act on the results.

Dr. Filuk sufficiently explained that the meconium test results were communicated to him for C.W.'s diagnosis and treatment. The trial court properly admitted the test results under ER 803(a)(4) through the doctor's testimony. The father fails to show an abuse of discretion.

C. Out-of-Home Placement

The father challenges the trial court's dispositional ruling that placed C.W. in out-of-home care. A trial court's placement decision is discretionary and will not

24

be overturned on appeal absent an abuse of discretion. In re Dependency of A.C., 74 Wn. App. 271, 275, 873 P.2d 535 (1994). The "child's best interest is the paramount concern in placement decisions." A.C., 74 Wn. App. at 277 (citing In re Dependency of J.B.S., 123 Wn.2d 1, 8, 863 P.2d 1344 (1993)). A placement decision involves a "highly fact-specific inquiry that cannot be reduced to a mathematical equation." J.B.S., 123 Wn.2d at 11. "Because a juvenile court must evaluate a considerable amount of information and weigh the credibility of numerous witnesses in order to balance the best interests of a child against a parent's rights, we place 'very strong reliance' upon a trial court's determination of what course of action will be for the best interest of the child." T.L.G., 139 Wn. App. at 15 (quoting In re Dependency of K.R., 128 Wn.2d 129, 147, 904 P.2d 1132 (1995)).

At disposition hearings, the rules of evidence need not apply, ER 1101, and the court "shall consider" the social file, social study, a GAL report, if any, and any reports filed by a party, in addition to evidence produced at the dependency trial, RCW 13.34.120(1). The trial court may order an out-of-home placement if it finds

> that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home, specifying the services, including housing assistance, that have been provided to the child and the child's parent, guardian, or legal custodian, and that prevention services have been offered or provided and have failed to prevent the need for out-of-home placement, unless the health, safety, and welfare of the child cannot be protected adequately in the home, and that:
> (a) There is no parent or guardian available to care for such child;
> (b) The parent, guardian, or legal custodian is not willing to take custody of the child; or

25

> *(c) The court finds, by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home.*

RCW 13.34.130(6) (emphasis added).

Here, the trial court found that it was currently contrary to C.W.'s welfare to return home and that the Department made reasonable efforts to prevent or eliminate the need for the child's removal, but those efforts were unsuccessful because his health, safety, and welfare could not be adequately protected in the home. The father does not challenge these findings. The court further found "by clear, cogent and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home." The father challenges the sufficiency of the evidence to support this finding. "Clear, cogent and convincing evidence exists when the ultimate fact in issue is shown to be 'highly probable.'" In re Dependency of T.L.G., 126 Wn. App. 181, 197, 108 P.3d 156 (2005) (quoting In re Dependency of H.W., 92 Wn. App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998)).

The father argues that there is not clear, cogent, and convincing evidence of a manifest danger. He argues he does not have a recent criminal history involving controlled substance, admitted to *medical* marijuana use, provided a clean UA when C.W. was discharged from the hospital, used fake urine for two UAs only to hide his medical marijuana use, and provided two clean UAs shortly before the disposition order. He argues he was successfully raising his older daughter and was actively engaged in C.W.'s medical and daily care before the baby's removal from the parents' care. He argues C.W. was a healthy and drug-

free infant when he was removed. But the father relies on a view of the evidence in his favor, contrary to the abuse of discretion standard of review.

The evidence presented at the dependency trial and the disposition hearing supports the finding of a manifest danger. In addition to the evidence supporting the finding of dependency discussed above, the mother provided a positive UA for methamphetamine and amphetamine shortly before the entry of the disposition order. This was her second positive UA for the same drugs and is consistent with C.W.'s meconium test results. Concerns also arose about the safety of the parents' home when the buildings on their property, except for their fifth wheel, "has burnt to the ground." When a social worker attempted a walk-through, the father refused to let the social worker in, claiming he had locked the door and had lost the key, and the mother "wouldn't answer the door because she sleeps like a freaking rock." He testified, "You could knock on her head, and it wouldn't wake her up."

In entering the disposition order, the trial court stated that the father was either ignorant of the mother's drug use or covering for it. Either way, the court was concerned about his ability to care for C.W., an infant with special needs. The evidence in the record sufficiently shows it was "highly probable" that C.W. would suffer serious abuse or neglect if he were returned home. The father fails to show an abuse of discretion in the child's out-of-home placement. For the reasons discussed, we find no basis for reversal.

We affirm the orders of dependency and dependency disposition.

_____

WE CONCUR:

_____    _____